Case number 11-1428 at L. Delta Construction Company, Inc. at L. Petitioners v. Environmental Protection Agency. Mr. Congressor, for Petitioner, Plant Oil Powered Diesel Fuel Systems, Inc. Mr. Durkee, for Respondent, DOJ. Mr. Hatzianek, for Petitioner, Delta Construction Company, Inc. at L. And Ms. Walter, for Respondent, DOJ. Thank you. Thank you. Thank you. Good morning. You can go ahead. May it please the Court. Clyde Congressor on behalf of Plant Oil Powered Diesel Fuel Systems. The good news is that Pop Diesel's engine equipment offers singular benefits to new heavy-duty diesel engines to take steps to slow or reduce global warming by enabling them to operate on 100 percent plant or vegetable oil. And this equipment and fuel can play a sizable part in replacing the use of fossil fuel use in the heavy-duty sector. The bad news is that the tailpipe rule injures Pop Diesel by disabling a Pop Diesel-equipped new engine from ever reaching the marketplace. A Pop Diesel engine, heavy-equipped engine, running on 100 percent vegetable oil fuel produces more carbon out the tailpipe, and it also consumes more fuel, plant oil fuel. And that fact, first of all, the fact of the higher carbon emissions out the tailpipe is stated in the reply brief. The fact of the higher consumption of fuel is stated and discussed at the bottom of Pop Diesel's petition for reconsideration on page 2 of that document, which appears at page 3 of Pop Diesel's supplemental appendix. Counsel, let me ask you this. Assuming you have Article 3, your client has Article 3 standing, assuming that for argument purposes, the line of cases in the circuit, White Stallion and other cases, that suggests you're not within the zone of interest that would properly permit you to pursue. And I can find no exception to this in our circuit law? And what's your answer? Well, I argue that Pop Diesel is peculiarly suited to assert the purposes of both statutes at issue here. No, but I'm not. I want to be a little bit more focused on the precedent. I don't have any doubt that you would want to assert that you think you can do this. The case law says it's too bad you're not within the zone of this statute that would allow you to pursue this claim, assuming that you have Article 3 standing. I think that the only reason that Your Honor could say that, and please, of course, I'm sure you'll tell me if I'm wrong, is because of the fact that at the moment we are not producing new engines. But what I'm saying is that both statutes disable Pop Diesel from ever producing new engines. No, I don't think that is not my understanding of the line of analysis. If I'm wrong, you can tell me. The Court is assuming that there is Article 3 standing in these cases, but they're assuming that the competitor standing situation in which you're in doesn't put you in the class of litigants that Congress intended to pursue these claims. Even though your interests may be, in some ways, aligned to the federal government's interests. That's what that case law says. You're not within the zone. I believe that it does, Your Honor, and this has to do with an argument of congressional intent as to what is meant by the Energy Act, Section 42 U.S.C. 39, I'm sorry, the O2K2. And the issue is, as I was starting to give the factual premise for this argument, Your Honor, is that plant oil fuel has lower energy content than petroleum diesel. And that fact is in the record as well in the emissions results from West Virginia University at pages 312 and 412 of the undersealed volume of Pop Diesel supplemental appendix. And the problem is that the tailpipe rule, contrary to statute, and I'll get into the statutory language in a moment, but what the tailpipe rule does, and this is most concisely stated on the third page of the Department of Transportation's denial of Pop Diesel's petition for reconsideration, the tailpipe rule calculates fuel consumption performance of heavy-duty engines by measuring tailpipe carbon dioxide emissions and converting the measured value to an equivalent fuel consumption value. So the tailpipe rule measures fuel consumption. The statute does not mention fuel consumption. The statute directs DOT to maximize fuel efficiency. And efficiency, if you look it up in the dictionary, is a measure of energy input to a machine or an engine per unit of work performed. I understand all that, but how is that responsive to Judge Edwards' question? You're really not responding to my question. What's the answer to his question? The court in White-Stallion understood the pecuniary interests you have and that your interests may align with the federal interest, the agency's interest, and said, nonetheless, you're not within the zone. But there was an exception made for a petitioner whose particular situation is peculiarly aligned with the statutory purposes. And this is the point that I was getting to, is that the DOT has adopted fuel efficiency standards that don't measure fuel efficiency. They measure fuel consumption. And Pop Diesel is prejudiced by that because of the fact that our fuel has lower heat content. Therefore, it requires greater fuel consumption for an engine equipped with our equipment, which means that we will never possibly satisfy the tailpipe rule's measure of fuel efficiency, which is, as they describe it, fuel consumption. But if you look to the plain meaning of the word efficiency, it's actually the measure not of fuel consumed to produce work output, but of energy consumed. So it requires looking at the energy content of the fuel. And if that is done, then Pop Diesel is not prejudiced at all because a Pop Diesel-equipped engine will consume the same amount of energy going into the engine to produce a unit of work output as would a petroleum diesel engine. But we are prejudiced by the mis-aligning the standards, the fuel efficiency standards, to measure fuel consumption, which is not mentioned in the statute. And what I'm trying to suggest to you is that you are prejudiced is not the test, right? I understand. I mean, you may be right, but I'm looking at the language of the court, and they're assuming that, in fact, there may be some prejudice to those who would want to pursue the claim because you've got interests and you're arguing that some of those interests are aligned with what the agency's doing. The court says it's too bad. Well, all of our interests are perfectly aligned with those of the statute. I understand, but the court is saying that's not enough.  In our case, we are maybe perhaps the only situation in which we are prejudiced by the tailpipe's rule measure of both carbon emissions coming out the tailpipe, because our kind of engine will produce higher carbon emissions, yet we have singular benefits in actually reducing overall greenhouse gas emissions, as well as the fact that, on the fuel efficiency side, that the standards aren't measuring fuel efficiency. They're measuring fuel consumption, which we are prejudiced by. So I stand here to inform you that the fuel efficiency standards are not meeting the plain meaning of the statutory directive to DOT to maximize fuel efficiency. And I'm trying to address Your Honor's question, and if there's another angle of view. I hear your answer. You don't have much time left. Were you done with standing? Because I was just going to say, do you want to say something about the merits quickly? Yes, please. Because you're almost out of time. And I would ask for permission to submit a standing declaration by Pop Diesel's director of new engine development. He could explain these issues more clearly than I can. I think that's untimely. That's untimely. I understand, Your Honor. It should have been done at the first opportunity, which would be either in response to a motion for summary dismissal, which did not occur, or in your opening, if there's an attachment to your opening brief. I understand, Your Honor. I know the court has allowed. We just can't try factual questions here. Okay. It's a standing issue. That's all. It's not. But, you see, in the cases where we have allowed supplementary affidavits, they've always been in situations where, you know, the original filing and the affidavits raised all the issues, but the court had additional questions that had to be resolved. Whereas, if you look at your brief, I'm looking at page 30 of your brief. You have one paragraph on the Article III injury. You don't have any cites and no affidavits. You have basically three sentences here. And so, you know, there isn't really anything. There aren't any factual assertions supported by admissible evidence that need supplementing. I understand, Your Honor. The court's not used to practicing and would look at the record. And there is record evidence. I'm sorry. What did you say? I'm sorry. I'm not accustomed to practicing in this court. Oh, okay. And I apologize for that. Okay. All right. And I believe that there is evidence in the record addressed in the reply brief, and I've addressed some of it today, which would address the standing issue. May I have a moment to address the merits as well? You can take one minute. Okay. One more minute. That's it. All right. Yeah. What's the most important thing about the merits you want to tell us? The most important thing is that the tailpipe rule, this set of regulations, also is contrary to the Supreme Court's direction that EPA take measures to slow or reduce global warming. Under the particular provision of the Clean Air Act, that issue for mobile sources here, these regulations do not do that. That's an authorization, not a mandate, isn't it? No, it's a direct rule. Is that about EPA against Massachusetts? Yes. It's a directive subject to the engagement finding that EPA must take steps to slow or reduce global warming. And it's global warming. It's not tailpipe emissions. And that finding has been made. Okay. EPA has constructed regulations that only look at tailpipe emissions, and, in fact, they need to look at upstream emissions for all the different kinds of engines that can satisfy the heavy-duty market, as well as opportunities to sequester carbon from the atmosphere, which biofuels can do, and, in particular, our kind of equipment allows that to happen. Okay. Thank you. I'll give you a minute or two to rebuttal. Okay? Thank you. So we'll hear from the government at this point. Go ahead. May it please the Court, my name is Dan Durkee with the U.S. Department of Justice. If I may introduce my colleagues with me at the council table. In the center is Tom Byron, who is also with the U.S. Department of Justice. Although I am prepared to address Pop Diesel's arguments with regard to both EPA's action and NHTSA's action, Mr. Byron is available if the Court has questions that exceed my familiarity with those specific issues. Beside him is Michelle Walter, also with the U.S. Department of Justice. She's going to address the Delta construction petitioner's arguments at 11-1428, as well as the California construction petitioner's arguments in the next case, 13-1076. We also have Steve Silverman from EPA's Office of General Counsel and Tim Goodman, NHTSA's Assistant Chief Counsel. And in the courtroom, although they're not going to present an argument, for the interveners, we have Elaine Meckenstock from the state interveners and Peter Salzau from the environmental groups. Your time is up. Your Honor, it's a large crowd for a large rule that addresses a large problem. Before I turn to standing, I would like to point out that the regulations under review were the first ever to address on a national basis greenhouse gas emissions from and fuel efficiency of new heavy-duty vehicles and engines. These regulations that the agencies estimate will save over 22 billion gallons of gasoline and diesel fuel and reduce carbon dioxide emissions by 273 metric tons. Okay, but your theory, government's theory is we can't get to any of that because they don't have standing, right? That's right. So why don't you talk about standing? Your Honor, the top diesel lacks standing, both constitutional and on the zone of interest. You can address either one. I think, as Judge Edwards pointed out. Which do you want to address? Well, I think. Why would we address the constitutional issue if we can resolve it on the statutory issue? Well, the zone of interest is now considered statutory, and I think it is. Okay, so why don't we discuss that? It is, I think, on all fours with White-Stallion. As Judge Edwards noted, top diesel's interest might be incidentally aligned with the purpose of the statute, but there's no difference really between their situation and Petitioner Juhlander in the White-Stallion case. Why aren't they a peculiarly suitable petitioner, which is what White-Stallion said would be a? For the same reason that Juhlander, who had an economic interest, was not peculiarly well-suited. For the same reason that Petitioner. Well, but this is a company whose whole purpose is, I mean, their whole mission is, well, it's very different from White-Stallion. The whole mission of this company is to develop technology that reduces greenhouse gases. Yeah, sure, they're going to make money eventually, but this is the core mission of this company. Well, I disagree. I think that is exactly like Juhlander. Juhlander's mission was to sell natural gas, and top diesel's mission, as they say in their filings, is to sell more of their product. That's why they exist. What better motivation, then, for a petitioner to bring the resources and knowledge to bear? Well, that is contrary to how the court has analyzed parties in that position. That's how the court analyzed it in Hazardous Waste Treatment Council, in Cement Kiln Recycling, the cases that are cited in White-Stallion, and in White-Stallion itself, which was only decided, I think, two years ago, two or three years ago. So the precedent is clearly against a party in top diesel's position. Well, but there is this exception for petitioners that are unusually aligned with the purposes of the statute, correct? That's right. And in White-Stallion, what's the name of the company? Juhlander. Yeah, Juhlander. I mean, sure, they were in the business of trying to sell natural gas, but they didn't go into the business because they had some mission to reduce greenhouse gases, whereas that's exactly what top diesel is all about. But it's not unusually aligned. Did you mean to agree with Judge Sayle on that? That's not the test. It's peculiarly suitable. That's very different. Right, peculiarly suited. And the only case I can find is Ethel, where Ethel was allowed to pursue it because they wanted to improve their own ability to comply with the statute. Right, and the court in White-Stallion distinguished that. So your answer to Judge Sayle is there is no case other than Ethel, and they're not close to Ethel. So they're not peculiarly suitable. Is that your answer? That is my answer. Okay. I thought that was your answer. That's definitely the right answer. So let me ask you just about the Article III question. I mean, you know, Judge Ginsburg is absolutely right. We could look at the statutory question first, but I'm curious about your theory of Article III. I mean, their argument seems to be extremely logical. They say, look, this regulation basically prohibits them, their product, from being certified, from getting subsidies, and therefore they can't get any business. So they don't have any business. And so, I mean, how would a company like this ever have standing? How would a company who is challenging a regulation that precludes its business, under your theory, ever have Article III standing to challenge that regulation? Well, first, Your Honor, the point is the rule does not preclude them from going into business. That's the essential reason why they don't have standing. Because of the small business exception? No, not because of that, Your Honor. Because they concede in their reply brief that there's another reason why they can't sell their product. Their reply brief at four, they concede that the only customers that they can sell their product to without running afoul of the Clean Air Act's tampering restrictions are model year 2008-2009 heavy-duty trucks. Those are not regulated by the truck rule. There's no incentive that the truck rule could give that POP would like to see the agencies award that would have any effect on POP's customers. Okay. It's a completely separate barrier that's apart from the truck rule, so there's no traceability and there's no addressability from what the agencies might do differently in the truck rule. Now, if POP were to be an actual manufacturer, a manufacturer of heavy-duty engines certainly would have standing, but that's not where they are. They raised in their reply brief arguments why they're not able to, and they said today that they're precluded from. But that's speculative. Putting aside that it was raised late, it was raised the first time in their reply brief. As you noted yourself, Your Honor, they didn't say anything about that in their opening brief. But even if the Court were to look at those late assertations, they're pure speculation. There's nothing in what POP said even in their reply brief that there's no evidence they provided that other manufacturers would be willing to partner with them if the truck rule were different or lending institutions would loan them money if the truck rule was different. It's all speculation, and it all comes back to their insurmountable standing barrier that they can't sell anyway. So that's why they don't have standing. Okay. I note that in response to the efficiency argument, to the extent the Court gets to that, the agencies addressed that. If you look at the joint appendix at 368 and 386, the agencies did explain that efficiency can be measured by either fuel economy or fuel consumption and reasonably explained why the agencies went to fuel consumption. And then if the Court doesn't have any other questions, we would rest on the written submissions on the other issues. Thank you. Mr. Congressman, you can take two minutes if you'd like. First of all, fuel economy, as far as I'm aware, is the same thing as fuel consumption. The statute directs EPA to develop a program to maximize fuel efficiency, which is the measure of energy going into the engine, not fuel consumption. This case is about new engines, and Pop Diesel will never be able to introduce a new engine based on the tailpipe rule. I would like to address the cases that Judge Edwards was asking about. White-Stallion says that the zone of interest test is not meant to be especially demanding, and it says that this form of standing arises if there is some indicator that the claimant is a peculiarly suitable challenger to support the inferences that Congress would have intended eligibility to vindicate the purposes of the statute. And then White-Stallion goes on to say that this indicator exists if there is some reason to believe that a business would be an unusually suitable champion of Congress's ultimate goals. And as Your Honor was stating, that is what we exist for, is to vindicate the purposes of the Clean Air Act by slowing and reducing global warming by allowing the use of 100% plant oil, fuel, and Pop Diesel-equipped engines. We also vindicate the purpose of the Energy Act for reasons that I've already stated, that the regulations are contrary to the plain meaning of efficiency, which is defined in any dictionary to mean energy supplied to the engine, not fuel consumed. If I may make one point in closing, Your Honor, a question left open by a case titled Center for Biological Diversity versus EPA decided in January 2013. Judge Tattel wrote the opinion for the court, and there was a concurrence by Judge Kavanaugh, which basically left open the question, and Judge Kavanaugh raised the question with regards to that statutory provision, which dealt with stationary sources. This case allows the court to make the broader point with regards to the Clean Air Act as a whole, that EPA is required under the mandate, given the fact that the Supreme Court has made its ruling in Massachusetts versus EPA, that the EPA, when it is regulating emissions, has to look at the total net life cycle emissions, not just the tailpipe, but it has to include upstream emissions as well as sequestration. And I don't think that the court is compelled to reach that broader issue with regards to other provisions of the Clean Air Act, but with regards to this particular provision, I believe that it is compelled to reach that issue by virtue of the fact that the other remedies for engines basically are arbitrary because they further the use of fossil fuels that are not correctly calculated by the measure of only tailpipe emissions. Okay. Thank you. Thank you very much, Your Honor. Good morning. May it please the court. My name is Theodore Hadjiantich, and I represent petitioners of Delta Construction Company at all. Your Honors, this is a straightforward statutory interpretation case about whether the Environmental Protection Agency, EPA, can ignore with impunity a nondiscretionary statutory mandate to submit proposed rules to the Science Advisory Board, SAB, for peer review. There is a threshold issue here as to which standard of review applies, whether it's the unadulterated standard under the Administrative Procedures Act or the more stringent standard under the Clean Air Act. Isn't there another, even more threshold issue, and that is the government's argument about standing? Yes. Why don't you start with that? Okay. With regard to standing, the petitioners have filed declarations stating unequivocally that they are injured by the rule because they cannot afford the costs of the new trucks mandated. All right. But let's assume we were to vacate the EPA rules. Wouldn't the NHTSA rules, which are identical, virtually identical, still apply? No, Your Honor, for two reasons. Number one, the preamble to the regulations clearly states that the fuel economy standards of NHTSA and the greenhouse gas emission standards of EPA were developed together to act as one comprehensive national program. And where EPA's greenhouse gas emission standards fail, then NHTSA's standards must also fail. Where does it say that? I know you said that in your brief, but I didn't see any place. All I saw in the preamble was that compliance with the EPA rule, it says that compliance by a truck manufacturer within its rule assures compliance with the EPA rule and vice versa. Is there something in there which says that if one of them is vacated, the other will not be implemented? No, Your Honor, it doesn't say that specifically. What it says is that the two rules together constitute one integrated national program. But it says you can comply with one or the other, correct? That's correct. All right. So let's assume I'm right, that if we were to vacate the EPA rule, the NHTSA rule would still be in place. Let's just assume that's correct. Then how do you have, how's there any redressability here? In other words, we can't, even if you do have an injury, there's no way this court can redress it. Your Honor, petitioner's injuries are redressable when a favorable decision would likely remove one regulatory cause of the injuries. So the Supreme Court held in the 1977 case of Arlington Heights v. Metro Housing Development Corporation, and so the Supreme Court held in the 1982 case of Larson v. Valente. Only one regulatory cause of the injury needs to be removed to satisfy the redressability requirement. For the very same reason, it matters not that California has a similar standard. If the EPA standard is removed, that is the removal of one regulatory cause of the injuries. With regard to the injury fact issue, the petitioners state unequivocally that they cannot afford the costs of the new trucks mandated by the rules, and that that will result either in their closing down their businesses or their reducing their trucks in their fleets, and in either event, that will result in layoffs of employees. A clearer injury in fact is difficult to imagine under article three. Well actually, there's some ambiguity about that. There's nothing in the declarations that tells us that any one of the members of the association is imminently going to be purchasing a vehicle affected by the rule. What the declarations state is that they cannot afford new trucks that are mandated by the rule, and this rule- There are a lot of things I can't afford, but I have no intention of buying them in the interest of doing so. Oh, the declarations state clearly that the petitioners are in business that requires them to use heavy-duty trucks, and that at the end of the useful life of those trucks-  It's relevant as to when, because these standards, contrary to EPA's assertions, are not going to go away at the end of model year 2018. They form the baseline below which EPA will- So it could be after 2018, is that what you're saying? Before anyone needs to buy one? It may be, but the standards won't disappear after 2018. Why is that relevant unless you're saying that your members may be purchasing trucks after 2018? Is that what you're saying? Yes, well, that's possible. Well, possible isn't good enough. Under the case law starting with the Defenders of Wildlife against Lujan in the Supreme Court, and innumerable cases here, you have to have some definite plan. In that case, it was to visit the animals that would have been harmed. Yes, that's correct, Your Honor, and the declarations do say that as a matter of staying in business, their definite plans require them to purchase new trucks at the end of the useful life of the existing trucks. Well, that's like saying, I want to go visit the animals sometime before I die. I don't believe that's- Whereas the court said, well, let's see your ticket. I don't think that's analogous at all, Your Honor, with respect. Here, they're faced with a situation now. The injury now is they cannot afford the cost of new trucks, but they need new trucks. That's the part that's missing. To have association standing, one of your members would have to have individual standing, correct? For a petitioner, California Construction Trucking Association. Oh, yes. Yes. What else do we have? There are several petitioners, one of which is Delta Construction Company, which is a private company that uses heavy-duty trucks. Taking the case of Delta then, it's much more straightforward. If they haven't said they need to buy a truck, but they can't afford it, then they haven't adequately alleged an injury. But- We have all these cases involving environmental organizations, where we used to have them, but they actually read the precedents and conformed to them, in which we said, look, telling us you want to preserve the forest isn't good enough. You've got to tell us you've got some members who hike in there or do something in there who will be prejudiced. Now they do that. They produce actual members who are injured by the regulation or the lack of regulation. I don't see where you've done that. I would direct your honor to Joint Appendix page 1859, and it's paragraph nine of Skip Brown's declaration. Quote, Delta does not have the capital or the credit to invest in the expensive new trucks as the cost increases are prohibited. As a result, Delta will either go out of business or reduce the number of trucks in the fleet. Either way, the truck rule will involve layoffs of employees. In addition, the truck rule will result in fewer truck services, culminating in higher prices for construction and trucking. That's a very- I agree that that's the closest that you've come. That's your best bet. Yes, your honor. I'm just not sure whether this talks about anything that's imminent. What's imminent here? That's the Supreme Court's requirement, imminent, right? Yeah, that's correct, your honor. But what is imminent here is that these rules apply now. These rules don't apply in the future. The future impact is that there are going to be even more stringent rules which are going to make the trucks even less affordable, which will increase the likelihood of their going out of business. But here, Mr. Brown says- So it's the probability? Is that the- No, your honor. Here, Mr. Brown says that this rule makes the cost of the mandated new trucks prohibitive, such that he is either going to go out of business or reduce the inventory of trucks, and that will result in layoffs of employees. Let's take that and assume for the moment that's sufficient and go on. Okay, your honor. Let me ask you just a follow-up question to our earlier discussion about the impact of the California NHTSA rules. Yes. And my question, how can this be redressable if those will remain in place? Your answer was the courts have said that for purposes of redressability, you only have to knock out one of several barriers. Is that what you said? Yes, your honor. And what's your best case that says that? There are actually two cases that say exactly that. Arlington Heights v. Metro Housing Development Corporation, 429 U.S. 252 at 261, 1977 Supreme Court case. Also, Larson v. Valente, 1982 Supreme Court case, 456 U.S. 228 at 243, note 15. All right. Okay, thank you. We'll hear from the government. Thank you, your honor. Thank you. Good morning, your honors. Again, I'm Michelle Walter with the Department of Justice. And I'm addressing these issues with respect to what we call the truck rule, and I'm also addressing these issues that come up again in the car rule. I do want to turn to the standing issue first and just follow up on a couple of points that opposing counsel and your honors made. And the first is with respect to the injury that's being alleged. And just following up, Judge Tatel, on your point that it's, again, not only the NHTSA standards that are in place, but also the California standards, which interveners just informed the court, were recently adopted on December 5th, 2014. So NHTSA standards, California standards, and EPA standards are all separate, separately enforceable standards that provide one comprehensive program for manufacturers throughout the country to be able to comply with. Will the NHTSA rules remain in place if the EPA rules are vacated? Yes. Okay. And what about the two cases counsel just cited, Arlington Heights and Larson, for the proposition that that's irrelevant? Yes, my memory on those cases is a little sketchy, but I seem to recall that they wouldn't involve this type of situation where we have two distinct rules that do essentially provide the same requirements. So that in this case, basically compliance with one is compliance with the other. And because they are separate regulations, even if the court were to vacate EPA's rule, the NHTSA standards would still be in place, and any alleged injury that petitioners claim to have is still going to exist. I also wanted to touch on the redressability point. I thought that's what we were just talking about. It does overlap a little bit. I was focusing more on the injury part of it. But also with redressability, or excuse me, not redressability, I'm sorry, Your Honor, the impending nature of it, I apologize, that impending nature of their injury, the lack of that is also highlighted by the fact that these standards apply fleet-wide. In other words, they don't necessarily apply to one particular model of car. They apply to a manufacturer's entire fleet so that the manufacturer can average the standards for its fleet. So there's no evidence in the declarations either whether petitioners have purchased or imminently are going to purchase trucks that are actually going to have the new technology that would result in the increased costs. Well, they say in their affidavit, they say in the Delta affidavit, it says, counsel read it, it, quote, does not have the capital or credit to invest in the expense of new trucks. And that if these stay in place, it will either go out of business or what? As a result, it will either go out of business or reduce the number of trucks in the fleet. I mean, why isn't that enough for injury purposes? Going back actually to causation, then, again, for the reasons that we've talked about because of the NHTSA rule in California. I know, I know, but I was asking that there's several elements to standing. We were talking about the injury. Isn't that enough? It may not be redressable, but isn't that enough for injury? No, I don't believe it is, Your Honor, because, again, they haven't demonstrated that that's certainly impending, that they're actually going to purchase new vehicles, let alone purchase new vehicles that have new technology with the increased costs. These are the bare allegations that this Court has historically found insufficient to demonstrate that. So what should they have said? I'm sorry? What should they have said in this affidavit? They could very easily have said, given that these regulations cover model year 2014 to 2018, they could very easily have said that they've already purchased a model year 2014 or even 2015 truck that had increased costs that's caused them to incur. But they said they can't afford it. They said they don't have the capital to buy one of these trucks. Again, then they could have said that they wanted to buy a particular car, but, in fact, weren't able to do so. That's what they're saying here. They've given up speculation that they would not be able to purchase these cars because of increased costs. But, again, that's not something that we can know for certain because they haven't actually discussed any particular vehicle that the technology would apply to. And, again, going back to the— You mean what's missing is they say, okay, they say, well, we don't have the money to buy a new truck. You're saying what they should have said is, we want to buy a new truck, but don't have the money. We are going to buy a new truck. But don't have the money. And we are going to buy a new truck that's going to have these increased costs that we cannot afford. So your point is that they may not buy a truck, which seems unlikely for 5,000 members. And when they do buy a truck, they may be buying one that doesn't conform, doesn't carry the new technology and the higher its price tag. Correct. If they didn't want to buy one of these higher-priced trucks with the higher technology, why would they bring this challenge? I think that's a question opposing counsel would be better situated to ask. And I'm sorry, Your Honor. All right. I didn't have anything else in addition to standing— Well, I mean, it may be that they've got 5,000 members, some of whom may, in the course of the next few years, let them buy a truck. That does have the higher technology, right? They just haven't laid it out, but that may be why they're assuming the matter. It almost certainly is. Right. And may wouldn't be sufficient. They have to show it's substantially probable. Well, with 5,000 members, isn't it a virtual certainty? It could be, but they haven't said that. I'm sorry? It could be, but they haven't given allegations to that. Well, they certainly have 5,000 members operating trucks, heavy-duty trucks in California. So that they have said. So doesn't it necessarily follow that they will be buying or wanting to buy a truck if they could? That could follow. That could be an assumption you could make, yes. But, again— If we drew that inference, they would have standing, wouldn't they? No, because we saw the digestibility and causation hurdles today. Okay. This objection, however, will go away. The objection about the inadequacy of the Declaration of Paragraphs in 1859. I'm sorry. I missed the first part of this objection. Your objection that their declaration, the portion that counsel referred to earlier, is inadequate. That would be—your point there would be blunted by the inference that with all these people involved, that surely they'll be buying a truck. For only the injury portion of that inquiry? Yes. Yes. And I do want to point out that— I should have made you with your first point on redressability. I'm sorry? Leaving your first point on redressability. Yes. And I do want to point out that the Brown—that same declaration in paragraph 8, the paragraph directly above that, also acknowledges that the increase of new trucks, increased cost of new trucks, is attributable, at least in part, to the new fuel efficiency standard requirements, meaning the NHTSA standards. I just wanted to point that out for the Court's reference. Okay. You're going to cover your arguments with regard on the merits of the asserted claim to have the Board involved in the next case? I'm sorry, in the next case on this— This case is about their claim that you should have submitted to the Board, right? You're going to argue that in the next case? I don't know how we overlap these cases. Right. You want to argue it now? There are two different rules, and there are some different circumstances. Petitioner's challenge in this case is directly to the rule itself, whereas their challenge in the next case, the Carr rule, is to EPA's denial of reconsideration. But the same procedural argument is being made in both cases, and we do have an additional mootness argument in the next case. On your procedural argument, which one do you think is the best of your list, the formal review, the central relevance, which? I believe it would be the fact what we're calling harmless error, that it's not something that is of central relevance, and that would have been substantial. That's what I said, the central relevance is what you think is your best. And it's the fact that it's not substantially likely to have significantly changed the rule that ties together with the central relevance question. So, yes, I think that's our best argument, because here we have a rule that was largely supported, that petitioners themselves didn't challenge the cost analysis that EPA performed, that they're saying caused them the injury now. And they haven't pointed to anything with respect to anything in the technology, the cost of those technology, or the effectiveness of that technology, that they think the SAB would have actually commented on and provided any advice on. So without that, we have nothing to show that this rule would have actually been significantly changed. Can you imagine, under what circumstances would this deferential standard ever be met? Can you imagine one where, let's assume you had a case where it was very clear that a regulation had been circulated for formal, formally circulated for comment to other agencies, not OMB, but, you know, a statute actually required it, and the agency didn't do it. Can you imagine a situation when this standard review wouldn't be, could be satisfied? How could anybody show that it was of central importance? I think so. I mean, certainly if a petitioner had raised, for example, during the comment period, an issue that concerns the science or technical aspects or, in this case, the cost, and that was something that they claimed the SAB should have reviewed, I think that would be something that could be of central relevance. But here, those issues weren't raised, and so they weren't actually central to the inquiry. If there are no further questions, I will rest on the briefs and ask that the court either dismiss the petition on its standing grounds or deny it. Okay. Thank you. Okay, so now we're going to hear about the car rule, right? Is that next? Okay. Oh, wait. Hold on. Yes. Yeah, you get some rebuttal. We're still in the truck rule, right? Do I have a chance to rebut? Yes, you do. You absolutely do. Thank you. So you can take two minutes. With regard to the trade association, the California Construction Trucking Association, the declaration on the standing issue of Lee Brown, set forth on joint appendix page 1863 in paragraph 8, says, again, unequivocally, few California Construction Trucking Association members have the capital or the credit to invest in the expensive new trucks as the cost increases are prohibited. As a result, member companies will either go out of business or will cut costs in other areas to afford the new trucks. This will likely mean layoffs of employees, higher prices for construction hauling, and fewer truck services. And as Judge Ginsburg pointed out, there would be no reason for these plaintiffs, either the individual companies or the trade associations, to have instituted this lawsuit unless they were severely injured by this rule. One final point. Standing here is not undercut if a particular truck might not be affected by the rule. We're talking about the fleet requirement here. The 2001 decision of this court in Wabash Valley Power Association v. FERC held that it is irrelevant to standing that increased competition might not occur because parties suffer cognizable injury when an agency allows increased competition. And the Supreme Court held in the middle of last year, 2014, in the case of Susan v. Anthony List v. Driehaus, an allegation of future injury suffices if there is a substantial risk that the harm will occur. That's at 134 Supreme Court at 2341. Okay. All right.
judges: Tatel, Edwards, Ginsburg